Filed 7/17/24  P. v. Petrovich CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JARED LOUIS PETROVICH,<br><br>    Defendant and Appellant. | G062259<br><br>(Super. Ct. No. 06CF3677)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Sheila F. Hanson, Judge.  Affirmed.

James R. Bostwick, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

Jared Louis Petrovich appeals from the trial court's postjudgment order denying his petition for resentencing pursuant to Penal Code section 1170.95.[1]  Petrovich argues the court erred by admitting into evidence the transcripts from his 2011 trial and insufficient evidence supports his conviction for second degree murder under an implied malice theory.  Neither contention has merit, and we affirm the postjudgment order.

FACTS

A complete recitation of the facts can be found in our prior opinion *People v. Guillen* (2014) 227 Cal.App.4th 934 (*Guillen*).[2]

Suffice it to say, John Derek Chamberlain was arrested for possession of child pornography and was housed in Theo Lacy Jail; Petrovich was also a resident of the jail.  Chamberlain and Petrovich were housed in F Barracks West (F West).

In the center of F Barracks, bisecting F West and F Barracks East, was an enclosed guard station.  F West had dormitory cubes lettered A through H.  The dormitory cubes had four-foot privacy walls.  Because of the design of the dormitory cubes, there were spots not visible from the guard station.  One of the blind spots was on the east side of D cube.  F West had a dayroom where during the designated time 146 inmates could roam.

---

[1]  Effective June 30, 2022, the Legislature renumbered Penal Code section 1170.95 to section 1172.6 without substantive change.  (Stats. 2022, ch. 58, § 10.)  For purposes of clarity, we refer to the statute as section 1172.6 throughout the opinion.  All further statutory references are to the Penal Code, unless otherwise indicated.

[2]  On the court's own motion and for good cause, we take judicial notice of this court's record in case No. G046163.  (Evid. Code, §§ 452, subd. (d), 459.)

Inmates at the jail formed race-based groups called "CARs," Classification According to Race. In F West, there were three CARs: the Woods (Caucasians), the Paisanos (Mexican nationals), and the South-Siders (Hispanic Americans). Each CAR had a leader, a "shot caller," a second in command, a "right-hand man," an enforcer, a "torpedo," and a person waiting in command, a "mouse." There was also a "house mouse" for the entire barracks who was in charge of cleaning the barracks, distributing commissary slips, and communicating with the deputies about the barracks' needs. Inmates were aware of who occupied the roles and when a change occurred after someone left the barracks.

The shot caller and the right-hand man were responsible for determining which inmates were disciplined or "taxed." A common form of taxing was "the wall," where two inmates held an inmate against a wall for a specified period of time and hit him below the neck and above the waist. The shot caller authorized the taxing of inmates who did not follow jail rules or inmate rules. The shot callers used torpedoes to carry out the taxings. It was common for inmates to assault other inmates with "sensitive charges" such as child molesters (called "Chesters") and informants. All the CARs viewed the assault of inmates perceived to be child molesters or informants favorably.

At the time, Petrovich was the shot caller, Garrett Aguilar was the right-hand man and torpedo, and Stephen Carlstrom was the mouse for the Woods. For the Paisanos, Raul Villafana was the shot caller, Salvador Garcia was the right-hand man, and Miguel Guillen was the mouse. Deputy Kevin Taylor, Deputy Jason Chapluk, and a sheriff special officer were assigned to F Barracks. Taylor was in command of F Barracks.

The Orange County Sheriff's Department (OCSD) did not condone deputies utilizing the CAR system but because of the number of inmates, deputies used the shot callers to control the inmates. Taylor met with the shot callers almost daily and used them to control the barracks, discuss issues, and obtain information. In turn, deputies rewarded the shot callers. Deputies knew a shot caller would tax an inmate for violating the rules.

There was evidence that OCSD personnel told Petrovich that Chamberlain was a child molester and to assault him. Because the South-Siders ran F Barracks, Petrovich had to get its shot-caller's permission to tax Chamberlain and to show respect. Petrovich told the South-Siders shot-caller "Stretch" that Chamberlain was a child molester and to "do whatever." Stretch thanked Petrovich for letting him know. Petrovich returned to his cube and told everyone that Chamberlain was a child molester.

Later that day, during evening day-room time, Aguilar entered D cube and told Andrew Corral, a South-Sider, to leave because they had business to conduct. Corral moved to the other side of D cube. Corral overheard Petrovich tell Aguilar they were going to beat a "'Chester'" who admitted he likes them young, and Aguilar left D cube. Petrovich, the Woods shot caller, remained in D cube, while Villafana, the Paisanos shot caller, and "Stretch," the South-Siders shot caller, arrived in D cube. Corral heard them say they were going to beat and rape Chamberlain.

Aguilar went upstairs to J cube to bring Chamberlain to D cube. Aguilar escorted Chamberlain to D cube. As they entered D cube, Aguilar pushed Chamberlain to the floor and the attack began.

Multiple witnesses observed about four groups, totaling at least 30 inmates, enter D cube and assault Chamberlain for about 20 to 45

minutes.  Corral, who was still in D cube, saw Aguilar hitting, kicking, and stomping Chamberlain.  After Corral left D cube, he saw Aguilar repeatedly exit D cube, speak with Petrovich, and return to D cube.

Luis Palacios, a Paisanos, saw inmates going in and out of D cube, three or four groups of three or four inmates, taking turns hitting and kicking Chamberlain.  Palacios saw Petrovich hit Chamberlain first.  Palacios saw Aguilar grab hold of a bunk, elevate himself about three feet, and stomp on Chamberlain.  Aguilar also hit him.  Palacios also saw Guillen enter D cube, get on his knees, and make a couple downward striking motions during the beginning or middle of the attack.  Guillen was in D cube for at least two minutes.  Aguilar threw water on Chamberlain to wake him up and beat him more.  At one point, when Palacios was upstairs, Petrovich told him to "'keep walking don't look down.'"

Robert Mayfield witnessed four waves totaling at least 12 inmates assault Chamberlain; the first few waves each lasted a couple minutes but the last wave lasted a "ridiculous" amount of time.  The first wave was the Woods.  Aguilar struck downward with his fists and used the bunk for leverage as he stomped up and down on something behind a short wall.  Aguilar and other inmates put rubber-soled jail shoes over their hands before hitting Chamberlain.  Carlstrom held onto the bunk while he violently jumped up and down on something behind the wall.

While waves of inmates hit, kicked, stomped, and did other abhorrent things to Chamberlain over the course of about 30 minutes, three OCSD personnel sat in the guard station approximately 68 feet away.

Eventually, Aguilar stood on a table and waved a white cloth to get the deputies' attention.  Aguilar told deputies there was a man down in D cube and said, "'he told us his charges and it got out of hand.'"

5

Taylor and Chapluk entered D cube and found an unconscious Chamberlain. Deputies called for medical assistance and administered aid. When the paramedics took over, Chamberlain had no heart rate. Chamberlain was transported to the hospital where he was pronounced dead.

Chamberlain's cause of death was multiple severe blunt impacts leading to failed chest mechanism, asphyxia, and cardiac arrest. Nearly every region of Chamberlain's body had blunt force trauma injuries. Chamberlain had a total of 43 rib fractures and most of his ribs were severely misplaced; 21 of his 24 ribs were broken. His lung was punctured. Chamberlain's injuries could be equated with injuries suffered from a high-velocity car accident or a fall from multiple stories. Except for one rib fracture that caused a lung laceration, no single injury was fatal. Chamberlain would not have died without the head and rib injuries.

Investigators interviewed all 146 F West inmates that evening and the following morning, and some multiple times over the following weeks and months. Investigators interviewed 30 or more additional people, including over 20 OCSD personnel.

The day after the attack, a deputy overheard Petrovich admit to another inmate that he was involved in the killing of Chamberlain. The next day, investigators interviewed Petrovich after advising him of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436. He recounted how deputies told him Chamberlain was a child molester and to assault him.

Petrovich admitted "[he] was the mouthpiece for the whites" and held the "keys." When an investigator stated, "You kind of lit the fuse by telling the 'South-Siders' what you heard," Petrovich answered, "Right" and "You're right." He knew Chamberlain would be taxed. Petrovich said he was

never in D cube and did not touch Chamberlain.  He said about 50 inmates hit Chamberlain for about 20 minutes and admitted, "It got out of hand."

A couple weeks later, investigators interviewed Petrovich again. Petrovich explained child molesters, informants, and thieves were the three worst groups of inmates and there were no rules on taxing them.  He knew they were going to beat the "brakes off him" and he did not want to "look like a cop."  Usually, Petrovich would act as a referee, but he did not need to arrange anything and he did not want to get involved so he played cards. Petrovich looked into D cube and saw five or six Mexicans and White "dudes." Chamberlain was lying on his side against the wall breathing weird with his boxers hanging off.  Petrovich told everyone to stop and "put the red light" on the Whites.  He then signaled to Stretch that it needed to stop and continued playing cards.  Petrovich said the taxing got out of hand because it was "poorly orchestrated."

Over one year later, Orange County Weekly reporter Nick Schou interviewed Petrovich.  Schou reported the following:

Petrovich explained to Schou that while only White inmates can beat up another White inmate, that rule did not apply to child molesters because they were "wide open."  "'Petrovich did not dispute that he spread the word of Chamberlain's status as a sex offender to the inmates who carried out the attack against Chamberlain.'"  "'Petrovich knew Chamberlain was being beaten up because Petrovich had told the inmates now attacking Chamberlain that [he] was a "Chester" and he heard Chamberlain's yells for help.'"  "'Petrovich told Schou that he did not touch Chamberlain himself, but he acknowledged, "[he] lit the fire."  Petrovich told Schou that he told the inmates to stop the attack but "50 Mexicans" ran in there and "they kept on coming.'"

7

A jury convicted Petrovich and others of second degree murder of Chamberlain. The trial court sentenced Petrovich to 15 years to life in prison. As to Petrovich, we affirmed the judgment as modified. (*Guillen, supra*, 227 Cal.App.4th at pp. 1033-1034.)

Five years later, Petrovich filed a petition for resentencing pursuant to section 1172.6. The trial court summarily denied the petition. We reversed the trial court's postjudgment order denying Petrovich's petition and remanded with directions for the court to issue an order to show cause (OSC) and hold a hearing to determine whether to vacate his conviction. (*People v. Petrovich* (Jan. 19, 2022, G059834) [nonpub. opn.].)

On remand, the trial court issued an OSC. The prosecution moved to admit the transcripts from Petrovich's trial and filed a brief. Petrovich filed a brief and objected to admission of the trial transcripts (§ 1172.6, subd. (d)(3), Evid. Code, § 1291).

At a hearing, the trial court overruled Petrovich's objections to admission of the trial transcripts and admitted the clerk's and reporter's transcripts into evidence. The parties argued, and the court took the matter under submission.

In a written ruling, the trial court denied Petrovich's petition. The court opined that under current law, Petrovich was guilty of second degree murder under an implied malice theory. The court made its ruling without considering codefendants' statements. The court explained as follows: "The evidence proved Petrovich was the shot caller for the Woods and authorized and facilitated the taxing of . . . Chamberlain because it was believed he was a child molester. Pursuant to . . . Petrovich's authorization, . . . Chamberlain was escorted to a location in the jail where deputies were not able to observe the prolonged vicious attack that caused

8

the death of . . . Chamberlain. . . . Petrovich was the first person to hit . . . Chamberlain and he aided and abetted the others who beat . . . Chamberlain to death. . . . Petrovich acted in a manner that was dangerous to human life, he knew his conduct endangered the life of . . . Chamberlain and he acted with conscious disregard for life."

DISCUSSION

I. *Admissibility of Evidence*

Petrovich argues the trial court erred by admitting the transcripts from his trial. We disagree.

In *People v. Cody* (2023) 92 Cal.App.5th 87, another panel of this court rejected an identical claim. Like in our case, the trial court in *Cody* relied on transcripts from petitioner's original trial. (*Id*. at p. 93.) The *Cody* court rejected petitioner's argument the transcripts were admissible only if they met the requirements of Evidence Code section 1291. (*Cody, supra*, at pp. 103-104.) The court acknowledged that section 1172.6, subdivision (d)(3), provides that "'[t]he admission of evidence in the hearing shall be governed by the Evidence Code . . . .' [Citation.]" (*Cody, supra*, at p. 104.) However, the court added the following: "If the Legislature had stopped there, then we would likely agree with [petitioner's] interpretation of the statute. That is, we would find the prosecution is required to make a showing of witness unavailability under Evidence Code section 1291, before the trial court could admit the former testimony of witnesses at the evidentiary hearing. However, the law has an explicit exception that provides for the admission of former testimony: 'The admission of evidence in the hearing shall be governed by the Evidence Code, *except that* the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including *witness testimony* . . . .'

9

[Citation.]" (*Ibid*.) Thus, the *Cody* court held that petitioner's interpretation of section 1172.6 was contrary to the statute's plain language and would turn section 1172.6 evidentiary hearings into new court trials, contrary to the Legislature's intent. (*Cody, supra*, at p. 104.)

We agree with this well-reasoned authority and conclude the plain language of section 1172.6, subdivision (d)(3), compels the conclusion that a trial transcript is generally admissible at the section 1172.6 evidentiary hearing. The trial court did not err by admitting the transcripts from Petrovich's trial.

## II. Denial of Petition

Petrovich contends insufficient evidence supports his conviction for implied malice murder. Not so.

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be express or implied. (§ 188, subd. (a).) "The primary difference between express malice and implied malice is . . . the former requires an intent to kill but the latter does not. [Citation.]" (*People v. Soto* (2018) 4 Cal.5th 968, 976.) Implied malice murder instead requires the killing be proximately caused by an act, "'"'the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'"' [Citation.]" (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).) Proximate causation requires the act to have been a substantial factor contributing to the death. (*Ibid*.) And conscious disregard for human life refers to a state of mind in which the person knows the conduct is dangerous to others but does not care if someone is hurt or killed. (*People v. Murphy* (2022) 80 Cal.App.5th 713, 726.)

10

The guilt of an aider and abettor to a crime is based on the direct perpetrator's acts and the aider and abettor's own acts and own mental state. (*Reyes, supra*, 14 Cal.5th at p. 991.) Accordingly, a direct aider and abettor of implied malice murder must, by words or conduct, aid the perpetrator's commission of a life-endangering act with the knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and the aider and abettor must act in conscious disregard for human life. (*Ibid*.) Implied malice thus includes an objective component—an act that is dangerous to life—and a subjective component—the defendant's awareness of and disregard for that objective danger. (*People v. Knoller* (2007) 41 Cal.4th 139, 153-154, 157 (*Knoller*).)

In *Reyes*, our California Supreme Court clarified the type of act committed by an aider and abettor that is dangerous to human life for the purposes of implied malice murder. An act that merely creates a dangerous situation in which death is possible, depending on how circumstances unfolded, standing alone will not satisfy the proximate causation requirement of implied malice murder. (*Reyes, supra*, 14 Cal.5th at p. 989.) Rather, implied malice murder requires a high degree of probability death will result; the danger to life cannot be merely vague or speculative. (*Ibid*.)

Generally, a trial court's denial of a section 1172.6 petition is reviewed for substantial evidence. (*Reyes, supra*, 14 Cal.5th at p. 988.) Under this standard, we review the record """"in the light most favorable to the judgment below to determine whether it discloses substantial evidence— that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."" [Citations.]" (*Ibid*.) "The conviction shall stand 'unless it appears

11

"that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

Reviewing the entire record in the light most favorable to the judgment, we conclude substantial evidence supports the trial court's finding Petrovich directly aided and abetted second degree implied malice murder. With respect to the objective element, there was substantial evidence Petrovich's acts involved a high degree of probability that they would result in death. (*Reyes, supra*, 14 Cal.5th at p. 989.) Contrary to Petrovich's claim, he was intimately familiar with the CAR system. Petrovich was the Woods shot caller and in his words, "Held the keys," i.e., was responsible for the Woods. Petrovich admits the evidence establishes he approved taxing Chamberlain. The evidence demonstrated Petrovich told the Woods and the other shot callers that Chamberlain was a child molester. He admitted that by telling the South Siders, he lit the "'fuse'" or ""'fire"'" and knew the other CARs would tax Chamberlain as well. From this evidence, one can reasonably conclude he invited the other CARs to join in the taxing.

Although the evidence showed Petrovich hit Chamberlain only one time, Petrovich relied on Aguilar, his right-hand man/torpedo to perform the taxing. Petrovich brought Aguilar to D Cube and told him there was going to be a beating of a "Chester" who admitted he likes them young. Aguilar went upstairs to J Cube and brought Chamberlain back with him to D cube, a partially secluded area. Aguilar pushed Chamberlain to the floor and the ruthless beating began. Aguilar's horrendous and malicious actions demonstrate he knew there were no restrictions on Chamberlain's beating. Aguilar used the bunk for leverage while he jumped up and stomped on him. Aguilar put rubber-soled jail shoes over his hands and beat Chamberlain.

12

When Chamberlain passed out, Aguilar threw water on Chamberlain to wake him up and then continued the assault.

There was evidence Aguilar was acting at Petrovich's direction. On multiple occasions during the beating, Aguilar left D cube and spoke with Petrovich to keep him apprised of the situation and then returned to D cube. Despite hearing Chamberlain's cries for help and seeing his grave condition, Petrovich waited at least 30 minutes before getting involved and telling the White inmates to stand down. Additionally, while others, like Palacios, saw the beating, Petrovich instructed them to not interfere so the beating could continue. Petrovich's conduct was a substantial factor in Chamberlain's death and made it inevitable. Petrovich aided and abetted the murder of Chamberlain by ordering Aguilar and other White inmates to beat him up and inviting the other CARs to join with no limits. (*People v. Schell* (2022) 84 Cal.App.5th 437, 443 [defendant's presence at scene, participation in the attack, companionship with other perpetrators, conduct before and after the crimes, and motive of retaliation for disrespect all support finding that he aided and abetted an implied malice murder].)

As for the subjective element, there was substantial evidence Petrovich acted with an awareness he was endangering Chamberlain's life. (*Knoller, supra*, 41 Cal.4th at pp. 143, 153-156.) Petrovich explained to investigators that child molesters were one of the worst groups of inmates so there were no rules on them when it comes to taxing and they were "wide open." He knew the inmates were going to want to "beat the brakes off" Chamberlain. Based on Petrovich's statements, it was certainly reasonable to conclude he knew the taxing was going to be extreme and prolonged and would endanger Chamberlain's life. (*Knoller, supra*, 41 Cal.4th at p. 143.)

13

One cannot review this record and conclude the danger to Chamberlain's life was merely vague or speculative.

Petrovich asserts, among other things, the evidence was insufficient because he only authorized the Woods to tax Chamberlain, he did not have the authority to authorize the other two CARs to tax Chamberlain, he did not tell other inmates to beat Chamberlain to death, he hit Chamberlain only once, he stopped the Woods from continuing to tax Chamberlain, and OCSD personnel were complicit or at least did not believe Chamberlain was in danger. We can reject all of these contentions because they are merely an invitation for us to reweigh the evidence, which we may not do under substantial evidence review. (*People v. Jones* (2022) 86 Cal.App.5th 1076, 1090 ["Under a substantial evidence review, however, we do not reweigh the evidence"].) Substantial evidence supports the trial court's finding Petrovich directly aided and abetted second degree implied malice murder and thus, the court properly denied his section 1172.6 petition.

## DISPOSITION

The postjudgment order is affirmed.

O'LEARY, P. J.

WE CONCUR:

MOORE, J.

MOTOIKE, J.

14